**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

COLLEEN JACKSON,

                                  Plaintiff,                    5:19-cv-1188
                                                               (AMN/TWD)

v.

SYRACUSE CITY SCHOOL DISTRICT,

                                  Defendant.

**APPEARANCES:**                              **OF COUNSEL:**

**CENTOLELLA LAW, P.C.**                       **STEWART L. WEISMAN, ESQ.**
5793 Widewaters Parkway – Suite 210
Syracuse, NY 13214
*Attorneys for Plaintiff*

**FERRARA FIORENZA P.C.**                      **CHARLES C. SPAGNOLI, ESQ.**
5010 Campuswood Drive
East Syracuse, NY 13057
*Attorneys for Defendant*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

On September 25, 2019, Plaintiff Colleen Jackson ("Plaintiff") commenced this action against the Syracuse City School District ("Defendant" or "School District"), Nichole Murray, and Tina DeCarlo alleging violations of the False Claims Act, including retaliation in violation of the False Claims Act. Dkt. No. 1.[1]  Plaintiff acted as a relator (or whistleblower) and brought a *qui tam* action on the government's behalf.  *Id.*  On June 9, 2022, pursuant to a settlement, the Court

---

[1] Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

dismissed all claims with prejudice except Plaintiff's claim of retaliation against the Syracuse City School District.  Dkt. No. 19.

Presently before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 67 ("Motion"), Plaintiff's opposition, Dkt. No. 76, and Defendant's reply in further support, Dkt. No. 86.  Plaintiff also filed a motion to strike, Dkt. No. 88, and Defendant filed a response, Dkt. No. 89.  For the reasons set forth below, Defendant's Motion for summary judgment is granted and Plaintiff's motion to strike is denied.[2]

## II.    BACKGROUND[3]

### A.    Plaintiff's Performance Note

Defendant is a city school district organized and existing under the laws of the State of New York.  Dkt. No. 67-33 at ¶ 1.  Plaintiff is a teacher and has been employed by Defendant in various capacities since 2002, including as a special education teacher.  *Id.* at ¶ 2.  Starting on December 1, 2016, Defendant appointed Plaintiff to be a "P-TECH Coordinator" within the Career

---

[2] The case was reassigned to the undersigned on January 19, 2023.  Dkt. No. 36.

[3] Unless otherwise noted, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response.  *See* N.D.N.Y. L.R. 56.1.  The Court has also considered the parties' other submissions and attached exhibits.  The Court denies Plaintiff's letter motion requesting that the Court strike portions of Defendant's supporting materials filed on reply.  "This [C]ourt has discretion in deciding whether to strike portions of . . . reply papers."  *Aurora Loan Serv's., Inc. v. Posner & Assocs., P.C.*, 513 F. Supp. 2d 18, 19 (S.D.N.Y. 2007) (citing *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226 (2d Cir.2000)).  The disputed documents, including the resumes of the candidates chosen over Plaintiff for several positions, were properly submitted on reply as refutations and clarifications in response to Plaintiff's arguments in opposition or as responses to new issues raised by Plaintiff in her opposition.  *See, e.g., Bayway*, 215 F.3d at 226-27; *Utica Mut. Ins. Co. v. Munich Reinsurance America, Inc.*, 976 F. Supp. 2d 254, 260 n.8 (N.D.N.Y. 2013), *rev'd on other grounds*, 594 Fed. Appx. 700 (2d Cir. 2014); *see generally* Dkt. No. 89.  Defendant either accurately described and attested to the documents' contents in its opening motion and provides additional documentation now in response to Plaintiff's probing or had no reason to submit the documents until a new argument was raised by Plaintiff in her opposition.

and Technical Education Department.  *Id.* at ¶ 4.  While in this position, Plaintiff worked at Henninger High School.  *Id.*  Robert Leslie indirectly supervised Plaintiff in this position, *id.* at ¶ 6, and Defendant claims Mr. Leslie began reporting issues with the Plaintiff's performance to Assistant Superintendent for Secondary Education Anthony Davis almost immediately.  *Id.* at ¶ 7; Dkt. No. 77 at ¶ 7 (asserting only that Plaintiff was never made aware of these complaints).  In one instance, Mr. Leslie expressed frustration regarding Plaintiff's insistence that she be paid for covering another employee who was on medical leave.  *Id.* at ¶ 8.  Plaintiff asserts that she was never informed of any complaints about her attitude or work performance prior to this point, but that Mr. Leslie did directly express his frustrations regarding Plaintiff's request to be paid for substituting over the phone to her on September 7, 2017.  Dkt. No. 77 at ¶¶ 7-8.  Plaintiff, Mr. Davis, and Principal Brian Kavanagh later attended a meeting along with a union representative to discuss Mr. Leslie's complaints against Plaintiff on September 17, 2017.  Dkt. No. 67-33 at ¶¶ 9-10; Dkt. No. 77 at ¶¶ 9-10; *see also* Dkt. No. 67-17.  Separately, Mr. Leslie told Scott Persampieri, the Executive Director of Recruitment and Selection at the time, that he did not believe that Plaintiff should be considered for administrative positions.  *Id.* at ¶ 11.  At some point in 2018, Mr. Persampieri memorialized this information in the School District's applicant tracking system.  *Id.* at ¶ 12; Dkt. No. 67-2 at ¶ 5-6.  Again, Plaintiff asserts that she was never informed of this complaint regarding her fitness for administrative positions and that the proper protocol for performance issues was not followed.  Dkt. No. 77 at ¶ 11.  Soon after, Plaintiff requested to leave the P-TECH Coordinator position and return to teaching special education for the 2018-2019 school year.  Dkt. No. 67-33 at ¶ 16.

### B.  Plaintiff's Protected Whistleblowing Activity

Approximately a month after Mr. Leslie first expressed his frustrations over the phone to

Plaintiff and Plaintiff's conference with Mr. Davis and Mr. Kavanagh, in late October 2017, Plaintiff informed Vice Principal Sherri Finch that employees working in the School District's Twilight Academy Program were recording false hours and creating fake class lists to make it appear they were teaching when they were not even on school premises. *Id.* at ¶ 19. The Twilight Academy Program was a nighttime program for credit recovery funded by federal grant money. *Id.* at ¶ 20. The parties dispute whether Defendant immediately initiated an investigation into the allegations in November 2017, or whether Defendant waited until March 2018 to look into Plaintiff's claims by reviewing video footage. *Id.* at ¶¶ 21, 22; Dkt. No. 77 at ¶¶ 21, 22. In January 2018, Plaintiff reported the same allegations to the New York State Education Department Office of Audit Services, and later that year, she also reported the matter to the New York State Attorney General's Office. *Id.* at ¶ 23. A few months later, during a June 4, 2018 interview between Plaintiff and the School District's Chief Human Resources Officer Dr. Christopher Miller, Plaintiff disclosed that she was the person who had reported fraud in the Twilight Academy Program to outside authorities. *Id.* at ¶ 29. Plaintiff filed this action on September 25, 2019. However, the action was filed under seal such that it was not disclosed to Defendant or the public at that time. *Id.* at ¶¶ 31-32. The action was made public on May 17, 2022. Dkt. No. 17.

### C. The Alleged Adverse Actions Against Plaintiff

Plaintiff alleges that Defendant engaged in a sustained campaign of retaliation against her in response to Plaintiff's whistleblowing activities.[4]

---

[4] Plaintiff does not explicitly reference each act in her opposition brief, Dkt. No. 76, but does address each in her response to Defendant's statement of material facts, Dkt. No. 77. The Court addresses every possible alleged action but notes, as an alternative justification for summary judgment, that Plaintiff may have waived her opposition to summary judgment on the issues not raised in her opposition brief. *See Han v. Shang Noodle House, Inc.*, 20-CV-2266 (PKC) (VMS),

4

### i.    Failure to Hire as Assistant Director of Special Education

First, after obtaining her Certificate of Advanced Study, Plaintiff applied for the position of Assistant Director of Special Education in Fall 2017.  Dkt. No. 67-33 at ¶ 34.  On August 22, 2017, before Plaintiff made her first report about issues with the Twilight Academy Program, Director of Special Education Amy Evans stated in an e-mail that she was not interested in Plaintiff's candidacy for the position because of a lack of relevant experience.  *Id.* at ¶ 35.  Plaintiff was not chosen for the position, and the candidate chosen had previously been a principal and had a Ph.D.  *Id.* at ¶ 36.  Defendant also considered Plaintiff's performance in the P-TECH Coordinator role as reason to choose another candidate.  *Id.*[5]

### ii.    Assignment to Teach Middle School and Reassignment to PFLA

Second, on February 12, 2018, according to emails presented by Plaintiff, Plaintiff informed Mr. Persampieri she wished to return to teaching special education if she was not chosen for an administrative position.  Dkt. No. 75-11.  Mr. Persampieri told Plaintiff to fill out a transfer request form, and on the same date, sent an email to Mr. Davis informing him of Plaintiff's desire to teach special education and telling him that there was an open position at Lincoln Middle School.  Dkt. No. 75-12.  On April 5, 2018, after waiting to hear back, Plaintiff sent another email saying she wished to return to teaching special education, and though she expressed a willingness

---

2023 WL 5755213, at *5 (E.D.N.Y. Sep. 5, 2023) (citing *Triodetic Inc. v. Statute of Liberty IV, LLC*, 582 F. App'x 39, 40 (2d Cir. 2014) (summary order)).

[5] For many of the alleged adverse actions involving the failure to hire Plaintiff for certain positions, Defendant asserts that it relied, in part, on the performance issues flagged on Plaintiff's record related to the P-TECH Coordinator role.  Rather than contesting Defendant's reliance on the alleged performance issues in deciding not to hire her, Plaintiff asserts that the performance issues were baseless, that the School District did not follow proper protocol in addressing such issues, that the "false flag" of performance issues has tainted each of her applications, and that the false flag makes other candidates' qualifications irrelevant to this Court's analysis.  *See* Dkt. No. 77 at ¶¶ 7, 11, 13, 36, 58, 62, 63, 65, 67, 70, 73, 76, 84, 85, 86, 88.

to teach elsewhere, she preferred to stay at Henninger High School.  Dkt. No. 67-33 at ¶ 37; Dkt. No. 77 at ¶ 37.  Later that Spring, Defendant notified Plaintiff that she was assigned to teach special education at Lincoln Middle School for the 2018-2019 school year.  *Id.* at ¶ 38.  The position was within the scope of Plaintiff's certification, in her tenure area, would continue her at the same level of seniority, carried the same salary and benefits, and was located within a few blocks of Henninger High School.  *Id.* at ¶ 40.  Plaintiff complained through her union that she was being transitioned from a high school to middle school position.  *Id.* at ¶ 41.  In response, Defendant offered to change Plaintiff's assignment to Promising Futures Leadership Academy ("PFLA") at Fowler High School, and Plaintiff agreed to take the assignment.  *Id.* at ¶¶ 42-43.  Again, the position with the PFLA was in the scope of Plaintiff's certification, in her tenure area, would continue her at the same level of seniority, carried the same salary and benefits, and was located within two miles of Henninger High School.  *Id.* at ¶ 44.

### iii.    Delay of Tenure

During the period in which Plaintiff was reassigned to the PFLA program at Fowler High School, on June 20, 2018, Defendant notified Plaintiff of an error which led to the delayed granting of her tenure status, which should have been granted in 2015.  *Id.* at ¶¶ 45, 46; Dkt. No. 77 at ¶¶ 45, 46.  The letter informed Plaintiff that "the Board of Education voted to grant you tenure as a Special Education Teacher in the Syracuse City School District, effective November 20, 2015, at the end of your probationary period."  Dkt. No. 67-24 (letter). The parties dispute whether this letter indicates that Plaintiff was still on probation in 2018 or whether her retroactive tenured status was effective immediately upon receipt of the letter.  Dkt. No. 77 at ¶ 46.

### iv.    Nichole Murray's Placement at PFLA

After Plaintiff took the PFLA position at Fowler High School, Defendant also placed

Nichole Murray in the PFLA program.  Dkt. No. 67-33 at ¶ 47.  Nichole Murray was one of the individuals implicated in the scheme involving the Twilight Academy Program reported by Plaintiff in October 2017.  *Id.*  Defendant attests that Ms. Murray was placed at PFLA because they could not keep her at her previous position due to her misconduct but needed someone with her qualifications to teach a course in the PFLA program, so she was sent there to replace a long-term substitute.  *Id.* at ¶ 50.  Plaintiff disputes this justification and points out that Defendant was not willing to accommodate Plaintiff's requests for specific positions at other times because the School District refused to let her replace long-term substitutes.  Dkt. No. 77 at ¶ 50.

### v.    Failure to Hire as Student Support Services Coordinator

At some point after 2017, Plaintiff applied for the coordinator of student services position with Defendant.  Dkt. No. 67-33 at ¶ 51.  Plaintiff interviewed for the position, but ultimately, was not chosen.  *Id.* at ¶¶ 52-58.  Plaintiff and another candidate with lesser qualifications shared a reference for the position, but the reference was only contacted in relation to the other candidate's application.  *Id.* at ¶ 53.  Defendant asserts that the other candidate with lesser qualifications was chosen as a finalist, and therefore Defendant contacted her reference, because Defendant sometimes relaxes stated qualification requirements if a candidate is well-qualified in other ways.  *Id.* at ¶ 56.  Defendant also asserts that Plaintiff was not chosen as a finalist due to her performance in the P-TECH Coordinator role.  *Id.* at ¶ 57.  Defendant asserts that the candidate ultimately chosen was more qualified than Plaintiff.  *Id.* at ¶ 58.

### vi.    Failure to Hire to Independent Evaluator for CTE Position

Plaintiff applied for the position of independent evaluator in Defendant's Career and Technical Education ("CTE") program for the 2018-2019 school year.  Dkt. No. 67-33 at ¶ 59.  Plaintiff was interviewed for the position, but Defendant ultimately gave the role to a candidate

they assert was better qualified due to experience and education in the field of technology. *Id.* at ¶¶ 60-63.

### vii.    Failure to Hire as Education Specialist for Special Education

Plaintiff also applied for the position of education specialist for special education for the 2018-2019 school year. Dkt. No. 67-33 at ¶ 64. Plaintiff did not receive the position. *Id.* at ¶ 65. Instead, Defendant asserts it hired a candidate that it viewed as more qualified given the candidate's role as a dean of students for several years. *Id.* Defendant also asserts that Plaintiff's performance in the P-TECH Coordinator role contributed to the decision not to hire Plaintiff in the role. *Id.*

### viii.    Failure to Hire to Special Education Liaison Position

Plaintiff also applied for the position of special education liaison for the 2018-2019 school year. *Id.* at ¶ 66. Plaintiff did not receive the position. *Id.* at ¶ 67. Instead, Defendant asserts it hired a candidate that it viewed as more qualified given the candidate's role as a longtime special education teacher. *Id.* Plaintiff had only been a full-time special education teacher for two school years. *Id.*

### ix.    Failure to Hire as Assistant Director of Secondary Education

Plaintiff also applied for the position of assistant director of secondary education for the 2018-2019 school year. Dkt. No. 67-33 at ¶ 68. Plaintiff interviewed for the position, but Defendant ultimately gave the role to a candidate it asserts was better qualified due to experience as a tenured administrator and service as a high school principal for multiple years. *Id.* at ¶¶ 69-70. Defendant also asserts that Plaintiff's performance in the P-TECH Coordinator role contributed to the decision not to hire Plaintiff in the role. *Id.* at ¶ 70.

### x.    Failure to Hire as Administrative Intern/Vice Principal

Plaintiff applied for the position of administrative intern/vice principal multiple times but

was not selected. *Id.* at ¶ 71. Defendant contends that "multiple openings are filled each time an administrative intern or vice principal position is posted" and therefore "it is impossible to identify a specific candidate who was chosen over Plaintiff for a particular position." *Id.* at ¶ 72. Defendant also asserts that Plaintiff's performance in the P-TECH Coordinator role contributed to the decision not to hire Plaintiff in the role. *Id.* at ¶ 73.

### xi.    Failure to Hire as Dean of Students

Plaintiff applied for the position of dean of students for the 2019-2020 school year. *Id.* at ¶ 74. Plaintiff was interviewed for the position but was not selected. *Id.* at ¶ 75. Defendant asserts that Plaintiff's performance in the P-TECH Coordinator role contributed to the decision not to hire Plaintiff in the role. *Id.* at ¶ 76.

### xii.    Failure to Hire as Summer Health Teacher

Plaintiff applied for the position of health teacher for the summer of 2019. *Id.* at ¶ 77. Instead of being offered a position as health teacher, Plaintiff was offered a special education teaching position. *Id.* at ¶ 78. Defendant asserts that Plaintiff was assigned the special education teaching position because of the School District's needs and Plaintiff's experience and skill in teaching special education. *Id.* at ¶ 78.

### xiii.    Failure to Hire as Director of CTE and Assistant Director of CTE

Plaintiff applied for the positions of director of CTE and assistant director of CTE for the 2021-2022 school year. *Id.* at ¶ 80, 87. Plaintiff was not interviewed for the director role, and Plaintiff claims a candidate with lesser qualifications was interviewed. *Id.* at ¶¶ 81-83. Defendant asserts that Plaintiff was not interviewed for the director role, and was ultimately not chosen for either role, because of Plaintiff's performance in the P-TECH Coordinator role. *Id.* at ¶¶ 84-85, 88. Defendant also asserts that the two candidates chosen were better qualified than Plaintiff; the

candidate chosen as director had experience as a principal and vice principal with Defendant, and the candidate chosen as assistant director had prior experience working with career and technical education programming that was superior to Plaintiff's. *Id.* at ¶¶ 85, 88.

### xiv. Termination of the "SEASON" Program, Summer 2022 Employment, and 2022-2023 School Year Placement

For the 2019-2020, 2020-2021, and 2021-2022 school years, Plaintiff was assigned to the "SEASON" program as a retention specialist. *Id.* at ¶ 91. In that role, Plaintiff supported a program for students who were not going to graduate on time and were working toward their GEDs. *Id.* at ¶ 92. The position was funded by a grant that paid Plaintiff's salary and the cost of her benefits as well as other requirements of the program. *Id.* at ¶ 93. In late May 2022, Mr. Persampieri learned that the grant funding for the SEASON program would be ending by August 2022, and as a result Plaintiff's position would no longer be available. *Id.* at ¶ 103, 104. Despite the grant not ending until August 2022, Defendant asserts that its Director of Special Programs, Michael Puntschenko, determined that the program should end early because "the documentation he was receiving from [Plaintiff] and another employee (who was relying on information from [Plaintiff]) was very poor in quality, and the program was in disarray, and as such he was no longer comfortable seeking reimbursement from the grant based on their information." *Id.* at ¶ 104. Therefore, Mr. Puntschenko decided to end the program early at the conclusion of the 2021-2022 school year, in June 2022, rather than in August 2022 when the funding officially ran out. *Id.* Plaintiff asserts that she was never informed of any issues with her job performance. Dkt. No. 77 at ¶ 101. Defendant asserts that Mr. Puntschenko was not aware of Plaintiff's allegations regarding the Twilight Academy Program at the time he made the decision to end the SEASON program early. Dkt. No. 67-33 at ¶ 104. On May 31, 2022, Plaintiff was notified that funding for her position was ending. *Id.* at ¶ 105.

For the Summer of 2022, Defendant offered Plaintiff a summer school position as a health teacher. *Id.* at ¶ 101. Plaintiff asserts that this offer came late according to the governing Collective Bargaining Agreement and that it was only offered after Defendant preliminarily ended her role with the SEASON program. Dkt. No. 77 at ¶ 101. Regardless, Plaintiff had already accepted summer employment outside of the School District and did not take the offered position. Dkt. No. 67-33 at ¶ 102.

For the following school year, Plaintiff was sent a list of special education positions in the School District that were available as of June 9, 2022. *Id.* at ¶ 106. After a meeting, Plaintiff informed Defendant that she preferred to stay at the Sidney Johnson Center in Adult Education, where the SEASON program had been run, if possible. *Id.* at ¶ 111. Defendant asserts that Mr. Persampieri and John Dittman, the principal overseeing the SEASON program, looked into whether there were funded openings at the Sidney Johnson Center in Adult Education. Initially, Plaintiff was given a position at the Sidney Johnson Center in Adult Education, her preferred choice, but Defendant asserts it discovered there was no funding for the position in late July 2022. *Id.* at ¶¶ 114, 116; Dkt. No. 77 at ¶ 106. According to Defendant, the process of determining that there was no funding for the possible position took an extended period of time because "the existence of the positions was dependent on a number of factors including fluctuating student enrollment and grant requirements, among others." *Id.* at ¶ 113. By the time it became clear that there was no availability at the Johnson Center in Adult Education, Defendant asserts that most of the available special education positions initially listed as options for Plaintiff's consideration in other locations were no longer available because they had been filled by either other certified teachers or long-term substitutes. *Id.* at ¶ 117. Given the few positions remaining, Defendant informed Plaintiff that the remaining positions suited to her skills were in middle schools. *Id.* at

¶¶ 118-20.  Plaintiff asserts that other positions were available because they had been assigned to teachers not properly certified.  *Id.* at ¶ 121; Dkt. No. 77 at ¶ 106.  Irastina Reid, the Director of Special Education for Defendant, informed Plaintiff that many special education positions at the high school level require teachers with dual certifications, meaning teachers are required to have a content-specific certification in addition to their general certification in special education.  *Id.* at ¶ 123.  It is undisputed that Plaintiff did not have a content-area certification until August 2023, a year later.  Dkt. No. 77 at ¶ 124.  Defendant also does not dispute that several of the positions were filled by long-term substitutes.  Dkt. No. 67-33 at ¶¶ 125-29.  However, Defendant asserts that since those positions were already filled by the long-term substitutes, Defendant could not permit Plaintiff to displace those long-term substitutes merely because Plaintiff preferred those positions.  *Id.*  Such a system, Defendant asserts, would "discourage teachers from accepting positions as long-term substitutes, and discourage long-term substitutes from pursuing their certifications with diligence, due to the ever-present likelihood that they will be displaced from their positions by certified teachers who prefer the substitutes' positions to the ones they are assigned."  *Id.* at ¶ 129.  Ultimately, Plaintiff selected one of the special education positions at Ed Smith School, a middle school.  *Id.* at ¶¶ 133-34.

### xv.    Medical Leave Issues

In August 2022, around the time when Plaintiff was set to start her position at Ed Smith School for the 2022-2023 school year, Plaintiff learned that she would be undergoing knee replacement surgery on September 2, 2022.  *Id.* at ¶ 135; Dkt. No. 77 at ¶ 135.  The parties dispute whether Plaintiff knew about the surgery prior to accepting the position.  *Id.* at ¶¶ 136-37; Dkt. No. 77 at ¶¶ 136-37.  Plaintiff informed Defendant that she would be having surgery and would be unable to perform the duties of the position on August 27 or 28, 2022.  *Id.* at ¶ 139.  Classes

started ten days later.  *Id.* at ¶ 140.  After the surgery, Defendant asserts that Plaintiff's physician gave her medical notes indicating she would need to be out on leave for roughly a year, through August 31, 2023.  *Id.* at ¶ 143.

On January 4, 2023, while Plaintiff was on leave, Defendant's Director of Employee Services Jennifer Wells sent Plaintiff a memorandum stating that Plaintiff had been absent from work for more than five days and therefore must provide an update to Defendant's medical director.  *Id.* at ¶ 148.  Defendant asserts that Plaintiff failed to respond to a November 2022 request for updated information pertaining to her medical condition and need for continued leave.  *Id.* at ¶ 149.  Plaintiff insists she never received such a request, and that the January 2023 memorandum came "[o]ut of the blue."  Dkt. No. 77 at ¶ 149.  Plaintiff asserts that the School District was well-aware that she was on leave and that medical updates were to be provided by her treating physician. *Id.*  The Defendant received an update on Plaintiff's medical condition on January 27, 2023.  Dkt. No. 67-33 at ¶ 151.

Plaintiff's physician released her to work on April 11, 2023 with restrictions, including a prohibition on lifting more than twenty pounds.  *Id.* at ¶ 144.  Plaintiff points out that other employees of Defendant were allowed to return to work with similar restrictions, Dkt. No. 77 at ¶ 145, but Defendant asserts that the restrictions would have made it impossible for Plaintiff to perform her duties at the Ed Smith School given the "physical demands" of her position.  Dkt. No. 67-33 at ¶ 146.  Plaintiff was not permitted to return to work until the restrictions were lifted on August 31, 2023, after her assignment to the Ed Smith School ended.  *Id.* at ¶ 147.

### xvi.    Loan Forgiveness Issues

In the Summer of 2023, Plaintiff experienced difficulty in having the Defendant verify paperwork she needed to qualify for the federal Public Service Loan Forgiveness ("PSLF")

program.  *Id.* at ¶ 154.  Plaintiff was a participant in the PSLF program, which ensures that participants working in the public sector will have the remaining balance on their federal loan forgiven so long as they make a certain number of monthly loan payments.  *Id.* at ¶ 152-53.  In 2023, Defendant's Human Resources team informed Plaintiff that they could not complete her paperwork because there had been a "break in service."  *Id.* at ¶ 154; Dkt. No. 77 at ¶ 154.  After investigating the matter, Defendant informed Plaintiff that they had made an error caused by Plaintiff's information appearing in two separate computer systems, and that the error had been corrected.  *Id.* at ¶¶ 155-56.  Plaintiff does not dispute that she is now being credited with the proper number of qualifying loan payments and expects to achieve forgiveness at the appropriate time.  *Id.* at ¶ 157.

### xvii.    Mandatory Training Requirements Issue

Finally, in January 2024, Plaintiff received a memorandum that she had not completed her mandatory training requirements as of January 19, 2024.  *Id.* at ¶ 159.  Defendant contends that the memorandum was sent to Plaintiff and other employees in error and that Plaintiff received notice of the error on January 24, 2024.  *Id.* at ¶ 160, 162.  Plaintiff acknowledges receiving notice that the memorandum was sent in error but contends that Defendant has been inconsistent in its representations regarding the number of other employees who received the memorandum.  Dkt. No. 77 at ¶ 158.

### III.    STANDARD OF REVIEW

Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).  A court first

determines "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at *4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36–37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia*, *Anderson*, 477 U.S. at 249–50).

## IV.    DISCUSSION

Plaintiff's sole remaining claim, retaliation in violation of the False Claims Act, must be evaluated "under the burden-shifting approach of [*McDonnell Douglas*]." *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973)). First, Plaintiff must establish a *prima facie* case of retaliation under the False Claims Act by showing the following elements: "(1) [s]he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against [her] because [s]he engaged in the protected activity." *U.S. ex rel. Chorches*, 865 F.3d 71, 95 (2d Cir. 2017). Plaintiff's burden at this first step is "minimal." *Zann Kwan*, 737 F.3d at 844 (citation omitted).

Second, once Plaintiff has made her *prima facie* case, the burden shifts to Defendant to articulate a non-retaliatory reason for the alleged actions taken against Plaintiff. *Id.* at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).

Third, if Defendant successfully asserts a non-retaliatory reason for the actions, "the presumption of retaliation dissipates," *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005), the burden shifts back to Plaintiff, and she "must then come forward with evidence that the defendant's proffered, non-[retaliatory] reason is a mere pretext for actual [retaliation]." *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). Plaintiff's proffered evidence of actual retaliation must be "sufficient . . . to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the [Defendant] were false, *and* that more likely than not [retaliation] was the real reason for the [actions]." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 714 (2d Cir. 1996) (quotation omitted) (emphasis added). As a component of the third step, Plaintiff must provide evidence "that the desire to retaliate was the but-for cause of the challenged employment action." *Carr v. New York City Transit Authority*, 76 F.4th 172, 178 (2d Cir. 2023); *see also Parris v. NYCHA*, 18 Civ. 8299 (JPC), 2024 WL 1363582, at *10 (S.D.N.Y. Mar. 29, 2024) (applying the but-for standard in the FCA context).

### A. *Prima Facie* Case

First, Defendant argues Plaintiff has failed to make a *prima facie* case of retaliation.  The

parties do not dispute that Plaintiff engaged in protected activity under the FCA.  However,

Defendant argues that Plaintiff has failed to make out a *prima facie* case of retaliation under the

other elements of retaliation.  First, Defendant argues that several of the alleged retaliatory actions

do not constitute "adverse action" capable of establishing a *prima facie* case.  *See generally* Dkt.

No. 67-34; Dkt. No. 86 at 12.[6]  Second, Defendant asserts that, even under the lowered causation

standard at the *prima facie* step of the analysis, Plaintiff has failed to allege sufficient "temporal

proximity" to establish causation.  *Id.* at 13, 15.

### i.    Adverse Action

First, in relation to several of the alleged retaliatory incidents, Defendant argues that

Plaintiff has failed to make a *prima facie* showing that the Defendant took "adverse actions"

against her.  Dkt. No. 67-34 at 14, 15, 19, 120; Dkt. No. 86 at 14.  In turn, Plaintiff argues that the

actions, taken together, are enough to establish a *prima facie* case in relation to the incidents in

question.  Dkt. No. 76, at 12-13.  The Court finds that Plaintiff's allegations of, at least,[7] the

following incidents are not "adverse actions" sufficient to state a claim for retaliation under the

---

[6] Defendant's opening brief also argues that the employees of Defendant making the allegedly retaliatory decisions had no knowledge of Plaintiff's protected activity.  Dkt. No. 67-34 at 12-14, 18.  On reply, Defendant acknowledges that Plaintiff has sufficiently established "general corporate knowledge" after October 2017, and thus, Plaintiff has established her *prima facie* case as to the second element.  Dkt. No. 86 at 11-12.  Defendant's arguments regarding causation and lack of knowledge will accordingly be addressed by this Court under the remaining steps of the *McDonnell Douglas* framework.

[7] The Court also finds that Defendant may be granted summary judgment on these grounds in relation to other alleged instances of retaliation including Plaintiff's various transfers and assignments. Infra fn. 25, 28, 29.  However, for the sake of a thorough investigation of the record evidence, the Court chooses to primarily address those incidents under the third step of the *McDonnell Douglas* framework.

False Claims Act: (1) Nichole Murray's placement at PFLA, (2) Defendant's retroactive granting of tenure to Plaintiff, (3) the temporary error involving Plaintiff's loan forgiveness program, (4) the later-corrected memorandum indicating Plaintiff had not completed her mandatory training requirements, and (5) the corrected notification informing Plaintiff that she was absent without leave.  Therefore, in relation to these allegations, Plaintiff has failed to establish a *prima facie* case.

"An adverse action is a materially adverse change in the terms and conditions of one's employment."  *United States v. Spectra Holdco, LLC*, 17-CV-2732 (NGG) (JRC), 2024 WL 457110, at *7 (E.D.N.Y. Feb. 6, 2024) (citing *Mirza v. Garnet Health*, No. 20-CV-00556 (PMH), 2022 WL 826410, at *11 (S.D.N.Y. Mar. 17, 2022)).[8]  "Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015).[9]  At base, adverse actions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  *Tolbert v. Smith*, 790 F.3d 427, 435 (2d Cir. 2015) (internal quotation marks and citation omitted).  The allegations and evidence supporting

---

[8] "The Second Circuit has yet to define 'adverse action' for FCA retaliation claims, but courts in this Circuit have followed the lead of other Circuits and utilized a material adversity standard borrowed from Title VII."  *Parris*, 2024 WL 1363582, at *10 (S.D.N.Y. Mar. 29, 2024) (compiling cases).

[9] *Vega* provides separate "adverse-action" standards for Title VII retaliation and discrimination claims.  801 F.3d at 85, 90 (explaining the retaliation standard "covers a broader range of conduct than does the adverse-action standard for claims of discrimination.").  Courts in this circuit have applied the Title VII discrimination standard, which is the stricter standard, to FCA retaliation claims.  *See Parris*, 2024 WL 1363582, at *10 (listing cases).  Regardless of the proper standard for FCA retaliation claims, the Court finds that the actions described do not suffice because even the more forgiving standard excludes "petty slights [and] minor annoyances."  *Collymore v. City of New York*, 767 F. App'x 42, 46 (2d Cir. 2019) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)).

the actions listed above, and footnoted below in relation to Plaintiff's transfers, are insufficient to constitute an "adverse action."

Several of the actions detailed by Plaintiff were indisputably temporary and involved no lasting adverse effect on Plaintiff's employment.  Plaintiff does not dispute that she has now been granted tenure,[10] that she has received appropriate credit in her loan forgiveness program, that she was not penalized in relation to the training requirements, and that her leave was unaffected by the notice related to her absence.  Dkt. No. 77 at ¶¶ 45, 149, 151, 154, 157, 158.  In each incident, Defendant quickly corrected its error, and Plaintiff suffered no consequences as a result.  These incidents are not the sort of "material" adverse actions that suffice for claims for retaliation.  *Vega*, 801 F.3d at 85.  At most, these actions constitute temporary bureaucratic nuisances; they are facially incapable of sustaining a claim for retaliation.  *See, e.g., Nazon v. Time Equities, Inc.*, 21 Civ. 8680 (AT) (SLC), 2022 WL 18959570, at *15 (S.D.N.Y. Nov. 22, 2022) (finding employer's warnings, which did not result "in any further consequences," were not adverse employment actions) (citing *Chang v. Safe Horizons*, 254 F. App'x 838, 839 (2d Cir. 2007)); *Stewart v. City of New York*, No. 22-2775, 2023 WL 6970127, at *2 (2d Cir. Oct. 23, 2023) ("[C]riticism, verbal reprimands, and notices of potential discipline, by themselves, do not qualify as adverse employment actions.").

Similarly, Defendant's placement of Nichole Murray at the same school as Plaintiff, despite Plaintiff having blown the whistle on Ms. Murray's alleged fraudulent activities, is insufficient to

---

[10] Though Plaintiff attempts to make an issue of her probationary period once she was granted tenure, the Court agrees with Defendant that no reasonable reading of the letter informing Plaintiff of her tenured status could lead to the conclusion that Plaintiff was still subject to probation at the time.  *See* Dkt. No. 67-24.  Regardless, Plaintiff does not aver that she ever faced any adverse consequence of any alleged probation.

state a claim for retaliation. Though possibly uncomfortable for Plaintiff, Plaintiff provides no evidence of any confrontations or even interactions between Plaintiff and Ms. Murray at Fowler High School and can only point to their placement on the same "learning team." Dkt. No. 76 at 20. Without evidence, or even allegations, of any disruption caused by Ms. Murray's placement, this Court cannot find the existence of an adverse event. *See Tolbert*, 79 F.3d at 435 (requiring adverse actions to be "more disruptive than a mere inconvenience"). Even if such interactions were proven, and even if they caused Plaintiff discomfort, they would be insufficient to constitute an "adverse action." *See Collymore*, 767 F. App'x at 45 (finding no adverse action based on yelling and chastising); *Shultz v. Congregation Shearith Israel of N.Y.*, 867 F.3d 298, 308–09 (2d Cir. 2017) (finding no adverse action where all that was alleged are a "handful of uncomfortable incidents"). Moreover, in her letter detailing the alleged retaliation up until October 2018, Plaintiff stated she no longer wished to return to her old job and that she did not want to be moved from Fowler despite Ms. Murray's placement. Dkt. No. 75-18. Plaintiff's request to stay despite working alongside Ms. Murray lends further credence to the notion that Ms. Murray's assignment was not, as a matter of law, a "material" adverse action. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) ("petty slights or minor annoyances that often take place at work and that all employees experience are not materially adverse") (internal quotation and punctuation omitted).[11]

Therefore, the Court grants Defendant's Motion for summary judgment in relation to the allegations detailed above on the ground that Plaintiff has not alleged adverse employment actions.

### ii.    Causation

---

[11] Even "[t]aken in the aggregate, the actions still did not adversely affect [Plaintiff] in any material way." *Tepperwien*, 663 F.3d at 572.

Second, Defendant asserts that, even under the lower standard for causation at the *prima facie* stage, Plaintiff has failed to show causation for much of the alleged conduct. Dkt. No. 67-34 at 11. At the *prima facie* stage, plaintiffs alleging retaliation under the False Claims Act usually may satisfy the causation element by demonstrating mere "temporal proximity" between the protected activity and the alleged retaliatory conduct. *United States v. Northern Adult Daily Health Care Center*, 205 F. Supp. 3d 276, 300 (E.D.N.Y. 2016) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)).

Generally, there is no bright-line test for determining whether the protected activity and the alleged retaliatory conduct are sufficiently proximate, and there are conflicting cases on the issue. In the context of a Title VII claim, the Second Circuit has held that "five months is not too long to find the causal relationship," *Gorzynski*, 596 F.3d at 110, though where, as here, Plaintiff seemingly relies on temporal proximity *alone* to satisfy the *prima facie* element of causation, "the temporal proximity between the protective activity and adverse employment action must be 'very close[,]'" *Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 34 (E.D.N.Y. 2015). Here, Plaintiff alleges she first reported her whistleblowing activity to her supervisor in October 2017. Dkt. No. 77 at ¶ 14. The first instance of alleged retaliatory conduct, failing to hire Plaintiff as Assistant Director of Special Education, occurred soon after, later in the fall of 2017. Dkt. No. 67-33 at ¶¶ 34-36. The next instance of alleged retaliation occurred in April 2018, and Plaintiff alleges Defendant continued to engage in retaliation through the present.

Given the Court's findings at the next steps of the *McDonnell Douglas* framework, the Court need not rule on whether such allegations establish sufficient causation at the *prima facie* stage. Given the relative closeness between the first instance of the alleged retaliatory conduct and the protected activity, and the possibility that certain employees of Defendant did not learn of

21

the protected activity until a later date, the Court is inclined to continue its analysis assuming, without holding, that Plaintiff has established a *prima facie* case of causation based on temporal proximity for the allegations based on legitimate adverse actions.

Therefore, the Court assumes without holding that Plaintiff has established her *prima facie* case in relation to the remaining allegations. The Court will now assess the remaining allegations under the second and third steps of the *McDonnell Douglas* framework.

### B.  Articulation of a Non-Retaliatory Rationale

Moving on to the second step of the *McDonnell Douglas* framework, for the remaining activity alleged by Plaintiff, Defendant argues that it has satisfied its burden to articulate a "nonretaliatory rationale for the challenged decision[s]." Dkt. No. 86 at 11 (citing *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996) and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 508-509 (1993)). Defendant's rationale must be "objective and competent," and may consist of evidence detailing "the required qualifications for the subject position measured against plaintiff's qualifications including background in the relevant field." *Sweeney v. Research Foundation of SUNY*, 711 F.2d 1179, 1185 (2nd Cir. 1983).

Specifically, Defendant contends that it has provided sufficient evidence that the remaining actions detailed by Plaintiff were taken for one or more of the following reasons: (1) Plaintiff's performance in a quasi-leadership role with Defendant prior to her protected activity led to the School District disfavoring her applications for administrative positions,[12] (2) Plaintiff was less

---

[12] Complaint abouts Plaintiff's performance in the P-TECH role and her supervisor's note that she should not be considered for administrative positions are evidenced by an affidavit from her former supervisor, Robert Leslie, Dkt. No. 67-3, an affidavit from the former Assistant Superintendent for Secondary Education Anthony Davis, Dkt. No. 67-4, an affidavit from the former Executive Director of Recruitment and Selection Scott Persampieri, Dkt. No. 67-2, the deposition testimony

qualified than other candidates for the positions for which she applied,[13] (3) Defendant had particular staffing needs and limitations which necessitated their decisions,[14] (4) Defendant lacked funding to continue Plaintiff's role as a retention specialist for the SEASON program,[15] and (5) Plaintiff's performance in the SEASON program made it preferable to close the program a few months earlier than expected.[16]

The Court finds that Defendant has articulated and demonstrated, through specific evidence, non-retaliatory explanations for each of the remaining actions detailed by Plaintiff. Therefore, the burden shifts to Plaintiff to demonstrate, through evidence, that these explanations are mere pretext.

### C.  Plaintiff's Burden to Show Pretext and But-For Causation

Finally, Defendant argues that Plaintiff has failed to meet her burden to contradict its non-retaliatory rationales through evidence of pretext and retaliatory motive.  At the third step of the

---

of Mr. Persampieri, Dkt. No. 67-13 at 68, and an exhibit illustrating an "Applicant Note" on one of Plaintiff's applications noting that she lacked administrative experience, Dkt. No. 67-18.

[13] Plaintiff's relative lack of qualifications is evidenced by the affidavit of Mr. Persampieri, which details the specific qualifications considered by Defendant for each position, and the resumes of the successful candidates.  Dkt. Nos. 86-6, 86-7, 86-8, 86-9, 86-10, 86-11, 86-12.

[14] Defendant's specific staffing needs are evidenced by contemporaneous emails detailing Defendant's staffing considerations for certain job placements, Dkt. No. 67-19, and affidavits from the former Director of Special Education Amy Evans, Dkt. No. 67-10, and Mr. Persampieri, Dkt. No. 67-2.

[15] The SEASON program's lack of funding is evidenced by the affidavit of Scott Persampieri, Dkt. No. 67-2, and Defendant's own admission that a state employee informed her that the program's funding was ending in August 2022.  Dkt. 75-20.

[16] Defendant's evidence regarding the motivation for ending the SEASON program in June rather than August 2022 stems from the affidavit of Michael Puntschenko, the former Chief Financial Officer for Defendant.  Dkt. No. 67-6.  Specifically, Mr. Puntschenko swore that he decided to end the program early "because the documentation [he] was received from Plaintiff [] . . . was very poor in quality, and the program was in disarray, and as such [he] was no longer comfortable seeking reimbursement from the grant based on their information."  *Id.*

*McDonnell Douglas* framework, "the Court considers whether Plaintiff has met her corresponding burden of proffering sufficient evidence for a reasonable fact finder to conclude that [Defendant's] stated reasons for the [adverse actions were] a pretext for retaliation." *U.S. v. Maranatha Hum. Servs., Inc.*, No. 18-CV-8892 (KMK), 2024 WL 967093, at \*14 (S.D.N.Y. Mar. 5, 2024) (internal quotation marks omitted). As a component of this burden, Plaintiff "must present evidence that retaliation was the 'but-for' cause of the action." *Stewart*, 2023 WL 6970127, at \*2.[17] Thus, Plaintiff must show "both that the reason was false, *and* that [retaliation] was the real reason." *D'Andrea v. Nielsen*, 765 F. App'x 602, 607 (2d Cir. 2019) (summary order) (Title VII case); *see also New York ex rel. Khurana v. Spherion Corp.*, 511 F. Supp. 3d 455, 881 n.14 (S.D.N.Y. 2021) (FCA case).

Plaintiff has failed to carry her burden for the remaining allegations, and thus, the Court grants Defendant's Motion for summary judgment in its entirety. The Court will analyze each remaining instance of alleged retaliation.

### i.    Failure to Hire for Administrative Positions

First, Plaintiff was not hired for several administrative and quasi-leadership positions in

---

[17] In assessing causation at this stage (that is, beyond the *prima facie* stage), this Court uses the "but-for" standard from Title VII retaliation law. *Parris*, 2024 WL 1363582, at \*10; *Malanga v. New York Univ.*, No. 14 Civ. 9681 (WHP), 2018 WL 333831, at \*3-4 (S.D.N.Y. Jan. 9, 2018) ("[T]his Court joins the chorus of courts recognizing a 'but-for' causation standard under the FCA."). Plaintiffs alleging retaliation under the FCA need only establish "but-for" causation "after a defendant has established a legitimate, non-discriminatory reason for the adverse action." *Parris*, 2024 WL 1363582, at \*10 (quoting *Stewart*, 2023 WL 6970127, at \*2). As assessed above, at the *prima facie* step, Plaintiff need only establish an inference of causation, often through temporal proximity. *See Butler v. New York Health & Racquet Club*, 768 F. Supp. 2d 516, 529 (S.D.N.Y. 2011).

the School District.[18]  Defendant insists that Plaintiff was not hired, in part,[19] because one of

Plaintiff's former supervisors conveyed to Defendant that Plaintiff should not be considered for

administrative positions due to her attitude and performance in a quasi-leadership role in

September 2017.  Rather than a retaliatory motive, Defendant avers that Plaintiff was not hired for

these positions because of an explicit recommendation from her supervisor which was given before

the protected activity, meaning retaliation could not have been a motivator of her supervisor's

recommendation.  In response, Plaintiff suggests the underlying performance note on her record

was motivated by retaliation, and that the note caused her to be passed over for the positions.  The

Court therefore assesses whether there is any issue of fact as to whether the performance note was

placed on Plaintiff's record out of retaliation.

First, as a matter of law, Plaintiff's former supervisor's complaints themselves were not

motivated by retaliation.  Plaintiff does not dispute that her former supervisor's concerns regarding

her performance were reported to Defendant prior to her protected whistleblowing activity.  Dkt.

No. 77 at ¶¶ 11, 12.  Instead, Plaintiff merely asserts that her former supervisor failed to follow

proper protocol by not providing verbal counseling and a written memorandum in Plaintiff's

---

[18] As detailed in the background section of this decision, the failed administrative and quasi-leadership position applications include Plaintiff's applications to be the Assistant Director of Special Education, the coordinator of student support services, the education specialist for special education, the assistant director of secondary education, the administrative intern/vice principal, the dean of students, the director of career and technical education, and the assistant director of career and technical education.

[19] In addition to Plaintiff's performance in the P-TECH role, Defendant also provides evidence that it viewed the candidates ultimately chosen for the administrative and quasi-leadership positions as having superior qualifications.  As detailed below, infra section IV(C)(II), Plaintiff fails to provide any evidence suggesting this rationale is pretext for retaliation.  Thus, Defendant's qualifications rationale provides an independent basis upon which this Court grants summary judgment in relation to the decision not to hire Plaintiff for the administrative and quasi-leadership positions in question.

employment file.  *Id.*  But whether or not Plaintiff's former supervisor followed protocol is beside the point.  Even without additional documents in Plaintiff's file detailing the complaints, there is no disputing that the supervisor complained about Plaintiff's performance in September 2017, prior to the whistleblowing.  Dkt. No. 76 at 14.  Given that the complaint was made prior to the protected activity, the Court finds that Plaintiff has failed to provide any evidence suggesting that a question of fact exists as to whether her supervisor's complaints about her work were a pretextual retaliatory response to her protected activity.

However, the Court notes that despite Mr. Leslie's earlier complaints, Mr. Persampieri did not place the relevant performance "flag" on Plaintiff's applicant file until 2018, after the protected whistleblowing activity.  *Id.* at 15.  Therefore, the Court must also assess whether there is any question of material fact regarding whether the notation of Plaintiff's performance issues in her file was done in retaliation for Plaintiff's protected activities.

Beyond a blatant misreading of Mr. Persampieri's affidavit,[20]  Plaintiff's only other purported evidence suggesting that Mr. Persampieri's notation was motivated by retaliation is pure speculation regarding his awareness of the whistleblowing.  Plaintiff points to a list of the other School District employees she informed of her whistleblowing to suggest that Mr. Persampieri had to have been aware of the whistleblowing.  Of these reports to School District employees, seemingly only one was made prior to Mr. Persampieri placing the note on her file: Plaintiff's

---

[20] In her response to Defendant's statement of material facts, Plaintiff "denies" the fact that Mr. Persampieri did not know about Plaintiff's protected activity at the time he put the note on the record.  However, Plaintiff's sole evidence to the contrary is not evidence at all.  She states that "Mr. Persampieri stated in his affidavit that he learned that plaintiff reported concerns relating to the Twilight Program."  Dkt. No. 77 at ¶ 15.  However, the cited portion of Mr. Persampieri's affidavit reads "I was never aware that Plaintiff Colleen Jackson had reported concerns relating to the Twilight Academy Program, either within or outside the school district, *until I was contacted about this litigation in late 2022 or early 2023.*"  Dkt. No. 67-2 at ¶ 2 (emphasis added).

initial report to Vice Principal Sherri Finch in October 2017.  Dkt. No. 77 at ¶ 15.  Regardless, at this stage, Plaintiff cannot rely on mere corporate knowledge to satisfy her burden of demonstrating the existence of an issue of fact as to retaliatory motive and establishing Defendant's non-retaliatory rationale as pretext.  Otherwise, Plaintiff would be able to escape summary judgment solely through reference to the very same evidence supporting her *prima facie* case, eviscerating the *McDonnell Douglas* framework.  *See Zann Kwan*, 737 F.3d at 844 ("*for purposes of a prima facie case*, a plaintiff may rely on 'general corporate knowledge'") (emphasis added); *see also Trivedi v. N.Y.S. Unified Court Sys. Office of Court Admin.*, 818 F. Supp. 2d 712, 736 (S.D.N.Y. 2011) ("A plaintiff need not prove that the specific actors within an organization were aware that the plaintiff made allegations of retaliation *to make out a prima facie retaliation claim*; rather, general corporate knowledge that the plaintiff has engaged in a protected activity is sufficient") (emphasis added); *Ehrbar*, 131 F. Supp. 3d at 34 ("Plaintiff cannot rely on general corporate knowledge alone" to show causation).

More importantly, even if the Court were to take Plaintiff's suggestion that Mr. Persampieri was aware of the whistleblowing at face value, awareness alone is far from sufficient to establish that Mr. Persampieri was motivated by retaliation.  Plaintiff would still need to provide evidence suggesting that Defendant's rationale is pretext and that the note would not have been placed on her file absent Defendant's retaliatory motive.  After benefitting from the full discovery process, Plaintiff points to no evidence in the record to this effect, but instead, relies on "guesswork" and "theorization," which are insufficient.  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

Therefore, the Court grants summary judgment as to these allegations.[21][22]

### ii.    Failure to Hire for Non-Administrative Positions

Second, Plaintiff asserts that she was not hired for non-administrative positions in retaliation for whistleblowing.[23]  Defendant asserts that Plaintiff was not hired for these positions because there were more qualified candidates.  Plaintiff's only response to this rationale appears not to rely on evidence at all.  Instead, Plaintiff merely questions Defendant's evaluation of qualifications and insists that qualifications are "irrelevant" because of the "taint of the performance issue flag."  Dkt. No. 77 at ¶¶ 58, 62, 65, 67, 70, 85.  But Plaintiff cannot avoid summary judgment by merely disagreeing with Defendant's evaluation of her qualifications relative to other candidates.  *See Bringley v. Donahoe*, 499 Fed. Appx. 116, 119 (2d Cir. 2012) (summary order); *Moy v. Perez*, 712 Fed. Appx. 38, 41 (2d Cir. 2017) (summary order).  A claim

---

[21] In so ruling, the Court does not hold that a defendant can achieve summary judgment solely by denying knowledge, or that a plaintiff must prove a specific agent's knowledge to survive summary judgment.  Indeed, the Second Circuit has held otherwise.  *See Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  But a plaintiff must provide *some* evidence suggesting motive beyond general corporate knowledge.  "A jury . . . can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, *so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that an agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge*."  *Id.* (citation omitted).  This Court merely finds that, here, Plaintiff has presented no evidence of circumstances beyond Mr. Persampieri's employment with Defendant which could indicate to a reasonable juror that Mr. Persampieri possessed the requisite awareness to act with a retaliatory motive.

[22] This Court is mindful that a determination of a but-for cause is often left for the jury to decide.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005).  However, the Second Circuit has frequently upheld decisions granting summary judgment on grounds that the plaintiff lacked evidence capable of establishing but-for causation.  *See, e.g., Ya-Chen Chen v. City University of New York*, 805 F.3d at59, 73; (2d Cir. 2015); *Golden v. Syracuse Regional Airport Authority*, No. 23-1311, 2024 WL 4116427, at *3 (2d Cir. Sep. 9, 2024) (summary order); *Carter v. TD Bank, N.A.*, No. 23-950, 2024 WL 2828470, at *3 (2d Cir. June 4, 2024) (summary order).

[23] As detailed in the background section of this decision, the failed non-administrative position applications include Plaintiff's applications to be the independent evaluator in the CTE program and the special education liaison.

of retaliation under the False Claims Act, "is not an invitation for courts to sit as a super-personnel department that reexamines employer's judgments."    *Ya–Chen Chen*, 805 F.3d at 73 (internal quotation marks omitted).    Instead, Plaintiff must establish that her credentials are "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Moy*, 712 Fed. Appx. at 41 (citing *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (internal quotation marks omitted), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e)).    Plaintiff does not attempt to meet this burden, nor could she, given Defendant's specific and reasonable reasons for valuing other candidates' credentials over Plaintiff's.

Moreover, even ignoring the fact that Defendant did not offer Plaintiff's performance note as a rationale for the decisions not to hire her for non-administrative positions, the Court has already determined that there is no evidence upon which a reasonable juror could find that the "performance issue flag" was placed on Plaintiff's record as retaliation.    Therefore, Plaintiff's response fails to establish Defendant's rationale as mere pretext for retaliation.

As such, the Court grants summary judgment in relation to the decisions not to hire Plaintiff for non-administrative positions.

### iii.    Placement in Non-Preferred Positions

Next, Plaintiff argues that Defendant's placement of Plaintiff in positions she did not desire constitutes retaliation.[24]  In response, Defendant argues that each of these decisions was made due

---

[24] As detailed in the background section of this decision, these non-preferred placements include Plaintiff's initial assignment to teach middle school and then ultimate assignment at the PFLA at Fowler High School for the 2018-2019 school year, and Plaintiff's assignment to a special education position rather than a health position for the summer of 2019.

to extenuating staffing circumstances and the School District's needs at the time.  Plaintiff provides

specific responses for each transfer decision.  The Court addresses each in turn.[25]

First, for the 2018-2019 school year, Plaintiff argues that she was initially assigned to teach

special education in a middle school, despite her preference for staying at Henninger High, in

retaliation for her whistleblowing.  Defendant, in turn, provides the non-retaliatory rationale that

Plaintiff was initially placed at a middle school because "that was where her skills were needed

most."  Dkt. No. 67-33 at ¶ 39.  Attempting to assert that this rationale was pretext, Plaintiff points

to evidence that on February 13, 2018, officials with Defendant discussed Plaintiff's desire to

_____

[25] In the alternative, the Court grants summary judgment in relation to Plaintiff's placement in non-preferred positions on the grounds that such placements are not "adverse actions."  *See Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 498, 504 (S.D.N.Y. 2013) ("A lateral transfer does not generally constitute an adverse employment action for Title VII purposes") (internal quotation marks omitted); *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp. 2d 321, 335 (S.D.N.Y. 1999) ("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion.").  Plaintiff's (reversed) initial placement at Lincoln Middle School for the 2018-2019 school year was identical in all material respects to a similar position in a high school.  Dkt. No. 67-33 at ¶ 40.  As such, the transfer cannot qualify as an adverse employment action.  *See  Mudholkar v. Univ. of Rochester*, No. 00-7412, 2000 WL 1476576, at *2-3 (2d Cir. Oct. 4, 2000) (finding no adverse employment action under Title VII where the employee retained his title, "suffered no diminution in pay or benefits," "maintained the same responsibilities" and membership on a faculty committee, and relied only on "his own unsupported, conclusory statements, that his new position is any less prestigious or that his duties have been significantly altered" to try to establish that he suffered an adverse action); *Collazo v. County of Suffolk*, 163 F. Supp. 3d 27, 44 (E.D.N.Y. 2016); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 618 (S.D.N.Y. 2009).  Plaintiff's sole basis for characterizing this initial placement as retaliation is the fact that she did not want to teach there.  Dkt. No. 77 at ¶ 40.  But "subjective dissatisfaction with assignments does not constitute adverse employment action."  *Brown v. Snow*, No. 02 Civ. 7985 (GEL), 2006 WL 623594 at *5 (S.D.N.Y. Mar. 13, 2006), *aff'd sub nom. Brown v. Paulson*, 236 Fed. Appx. 654 (2d Cir. 2007) (internal citation omitted).  Finally, the fact that Plaintiff's placement at a middle school was temporary and reversed prior to her ever having to teach at the middle school, and that she agreed with her ultimate placement at a high school, indicates that there was no adverse employment action under any standard.  Similarly, Plaintiff's placement as a special education teacher in the Summer of 2019 represented a continuation of the same responsibilities she carried during the school year, and as such, cannot constitute an adverse action under any standard.  Therefore, Plaintiff has failed to make a *prima facie* case of retaliation in relation to her allegations of non-preferred placements.

return to special education and suggested that she might take an open position at Lincoln Middle School. Dkt. No. 75-12. Plaintiff asserts that this evidence shows that Defendant had already decided to send Plaintiff to a middle school prior to Plaintiff's expressed willingness to take any special education position, and that Defendant's decision to "mislead" her was a clear act of retaliation.

Plaintiff's argument that Defendant's rationale is pretextual fails upon a passing look at the evidence. Plaintiff attempts to gloss over the fact that, on February 12, 2018, prior to Defendant's internal discussions of her placement, Plaintiff emailed Mr. Persampieri requesting to return "to a Special Education teaching position for the 2018/2019 school year." Dkt. No. 75-11. In this email, Plaintiff did not articulate that she preferred to stay at Henninger High School. *Id.* Indeed, Plaintiff did not articulate such a preference until an April 5, 2018 email in which Plaintiff informed Mr. Persampieri that she was not necessarily looking to leave Henninger High School, but that she would go "wherever a special education position is available, in the event Henninger has no openings for 2018/2019." Dkt. No. 67-22. Thus, Defendant's internal emails represent nothing more than Mr. Persampieri's attempt to follow through on Plaintiff's own request to return to special education. Therefore, Plaintiff's attempt at providing any evidence of pretext, let alone an actual retaliatory motive, falls far short of satisfying her burden to rebut Defendant's stated rationale.

Outside of this baseless attempt at conjuring evidence of pretext, Plaintiff can point to no evidence suggesting an issue of fact as to retaliatory motive. As previously discussed, supra Section IV(C)(I), there is zero evidence in the record that Mr. Persampieri, the person who first suggested Plaintiff be assigned to Lincoln Middle School, was aware of Plaintiff's whistleblowing at the time the placement was made or that he acted in retaliation, beyond conjecture stemming

from his employment with Defendant.  Dkt. No. 75-11.

Second, Plaintiff asserts that her placement as a special education teacher, rather than a health teacher, for the Summer of 2019 constitutes retaliation.  As a non-retaliatory rationale, Defendant asserts that "its needs were better filled by utilizing Plaintiff's experience and skills in the special education teaching position," and that "[i]t is not uncommon for teachers to request one position and be given a different position for the summer based on the District's needs."  Dkt. No. 67-33 at ¶¶ 78-79.  Plaintiff points to no evidence whatsoever that this rationale is pretextual. Instead, Plaintiff merely asserts that Defendant "furnished no documents to support" its rationale. Dkt. No. 77 at ¶ 79.  But at this stage of the *McDonnell Douglas* framework, Plaintiff bears the burden to show pretext and to establish a retaliatory motive.  *Van Zant*, 80 F.3d at 714.  She has not done so.

Therefore, the Court grants summary judgment in relation to Plaintiff's placement for the 2018-2019 school year and as a special education teacher for the Summer of 2019.

### iv.    SEASON Program and Summer 2022 Employment

Plaintiff asserts that Defendant's decision to end the SEASON program funding two months early, and the related decision to offer her a different position for the Summer of 2022 rather than granting her application to stay with the SEASON program for the Summer, constituted retaliation.[26]  Though the record indicates that the ultimate decision to end the SEASON program

---

[26] In relation to the assignment for the Summer of 2022, Plaintiff puts forward an additional reason why Defendant's rationale is pretext for retaliation: Defendant's June 28, 2022 offer for summer employment allegedly broke protocol under the applicable Collective Bargaining Agreement.  Dkt. No. 76 at 23-24 (relying on Plaintiff's affidavit).  However, Defendant has submitted evidence demonstrating that the applicable Collective Bargaining Agreement merely requires that summer school placements be communicated "as soon as practicable . . . with the goal of having most positions filled by May 15th."  Dkt. No. 86-13 at 64.  Mr. Persampieri asserts that he was not made aware that the SEASON program funding was ending until "late May, 2022," and thus, could not

was not made by Defendant, but by the State, it was Defendant's decision to end the program two months early, thereby altering Plaintiff's summer employment.  Therefore, in light of Defendant's non-retaliatory rationale, the Court must assess whether Plaintiff can satisfy her burden to point to evidence capable of suggesting pretext and creating an issue of fact as to whether the decision to end the program early, effectively transferring Plaintiff to a new position for the Summer of 2022, would not have happened but-for a motive of retaliation.

Defendant asserts that Plaintiff was denied the ability to stay at her then-current position with the SEASON program for the Summer of 2022 because funding for the program was ending in August 2022, and Defendant was uncomfortable with seeking continued funding until that point due to Plaintiff's performance in the role.  Dkt. No. 67-33 at ¶ 101, 104.  In response, Plaintiff points out that she was never informed of any performance issues and implies that Defendant's rationale is inconsistent, asserts that the decision-maker Mr. Puntschenko was in charge of the program involved in her whistleblowing (the Twilight Academy Program), and suggests that Mr. Puntschenko had previously congratulated Plaintiff and the SEASON program on their work in reaching full enrollment, seemingly contradicting his criticism of her performance.[27]  None of these arguments satisfies Plaintiff's burden to produce evidence capable of demonstrating an issue of act as to whether Defendant acted out of retaliation.

---

have provided Plaintiff with additional notice.  Dkt. No. 67-33 at ¶ 103.  Plaintiff points to no evidence to the contrary, and therefore, the timing of the notice regarding Plaintiff's Summer 2022 employment cannot be seen as evidence of pretext, let alone a retaliatory motive.

[27] Plaintiff may also be read to argue that the fact that she was the sole SEASON employee whose employment relied on grant funding strongly suggests that the decision to end the funding was targeted towards her out of retaliation.  But Plaintiff does not dispute that the actual decision to end Plaintiff's position was out of Defendant's hands; a representative of the New York State Office of Children and Family Services informed Plaintiff that her contract end date would be August 14, 2022.  Thus, Plaintiff's speculation is misguided.

Plaintiff argues that Defendant's rationale is inconsistent, and therefore there is a material issue of fact regarding motive, because the email she received informing her of the end of the SEASON funding solely mentioned a lack of funding and did not mention any performance issues. Dkt. No 76 at 23. But Defendant's rationale is not inconsistent; the SEASON program was in fact ending due to a lack of funding at the end of August 2022, as conveyed by Mr. Persampieri in his email to Plaintiff on May 31, 2022. Dkt. No. 67-27. Regardless, at this stage, Plaintiff's burden is not only to suggest that Defendant's rationale is false through possible inconsistencies, but also demonstrate an issue of fact as to whether retaliation is the but-for cause of the adverse action. Plaintiff's inaccurate suggestion of inconsistency cannot overcome Plaintiff's failure to produce any evidence suggesting that Mr. Puntschenko was motivated by retaliation outside of his mere employment by Defendant.

Next, Plaintiff's attempt to demonstrate Mr. Puntschenko's incentive to lie about her performance similarly falls flat. The fact that Mr. Puntschenko was also in charge of the Twilight Academy program, which was the program involved in the whistleblowing, is insufficient to create an issue of fact as to whether the decision would not have been reached absent a retaliatory motive. Instead of pointing to evidence capable of suggesting a retaliatory motive, Plaintiff asks this Court to find a material issue of fact out of "conclusory allegations and unsubstantiated speculation." *DiGirolamo v. Metlife Group, Inc.*, 494 Fed. Appx. 120, 122 (2d Cir 2012) (summary order) (citation omitted).

Finally, Plaintiff's sole piece of actual evidence, an email from June 2020 in which Mr. Puntschenko congratulates the SEASON Program on reaching full enrollment, falls far short of carrying Plaintiff's burden. *See* Dkt. No. 75-21. The email predates the decision to end the SEASON program by a full two years. Moreover, Mr. Puntschenko's general congratulations on

34

reaching full enrollment, addressed to the entire SEASON team, can hardly be read to indicate his approval with Plaintiff's performance specifically. Even if it did, "[d]emonstration of past positive performance is insufficient to raise a genuine issue of disputed fact with respect to pretext." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 577 (S.D.N.Y. 2010).

The Court therefore grants summary judgment in relation to the allegations of ending the SEASON program early.[28]

### v.      SEASON Program and 2022-2023 School Year Placement

Plaintiff also asserts that her placement at the middle school level in Ed Smith School for the 2022-2023 school year was motivated by retaliation. Though Plaintiff's placement for the 2022-2023 was also impacted by the ending of the SEASON program, it was not Defendant's decision to end the program early but the state's decision to stop funding in August 2022 which necessitated Plaintiff's transfer to a new position for the school year. Therefore, unlike in relation to the Summer 2022 placement, the Court need not consider Defendant's motivations for ending the SEASON program early, but instead, must consider the evidence relating to Plaintiff's placement alone.

Defendant explains that, after it became clear that she would need to transfer for the 2022-2023 school year, Plaintiff failed to indicate a preference for jobs outside of the Sidney Johnson

---

[28] In the alternative, the Court grants summary judgment on these allegations because Plaintiff did not suffer an adverse employment action. Plaintiff was not guaranteed a continuation of the position for the Summer; she had to apply. Dkt. No. 77 at ¶ 101. Moreover, Plaintiff was not left jobless by the decision to end the program early; Defendant offered Plaintiff a job as a health teacher for the summer, a position for which Plaintiff had previously expressed a preference. Dkt. No. 67-33 at ¶¶ 77, 101. That Plaintiff had already accepted another job cannot provide grounds to sustain a claim of retaliation. At most, Defendant's decision amounts to a transfer of Plaintiff to a new position for the Summer of 2022. A transfer, without any suggestion by Plaintiff that the offered health teacher job could constitute a demotion, is insufficient to establish an adverse action. Supra fn. 26.

Center in June 2022. Dkt. No. 67-33 at ¶ 111. Defendant initially attempted to pair Plaintiff with a position at the Sidney Johnson Center but determined there was a lack of funding for the position. By the time it was determined that there was no availability at the Sidney Johnson Center in July 2022, most of the jobs initially presented to Plaintiff in June as options for the 2022-2023 school year were filled. *Id.* at ¶ 117. The remaining jobs were either 1) in a middle school setting, or 2) involved teaching students with severe behavioral problems. Defendant determined Plaintiff's skills were not suited for teaching students with severe behavioral problems, and that her lack of a content-specific certification weighed against placing her at the high school positions. *Id.* at ¶ 123. Defendant also presents evidence, in the form of Mr. Persampieri's affidavit, that it was not Defendant's practice to displace a long-term substitutes that had already been assigned to other high school positions merely because a special education certified teacher expressed a preference for a high school position. Dkt. No. 67-2 at ¶ 52. Therefore, Defendant offered Plaintiff the two remaining roles in the middle schools. In summary, Defendant asserts a number of non-retaliatory factors explain Plaintiff's placement: Plaintiff's failure to indicate an alternate preference beyond the Sidney Johnson Center, the lack of clarity regarding the availability of positions at the Sidney Johnson Center, Plaintiff's lack of a content-specific certification and skills with specific students, and the fact that the vast majority of the previously available positions had been filled by the time Plaintiff was considering alternatives. In response, Plaintiff asserts that Defendant's agent making the decision had not observed Plaintiff's skills with students with behavioral problems, and that Defendant did not actually have a policy against displacing long-term substitutes from positions they had already filled. Dkt. No. 76 at 18.

The Court finds that Plaintiff has failed to meet her burden to show evidence upon which a reasonable juror could conclude that Defendant's rationale is pretext, and that retaliation was the

but-for cause of Plaintiff's placement.[29]  Most importantly, Defendant has provided uncontroverted evidence that it initially placed Plaintiff at her preferred position (another slot at the Sidney Johnson Center), but that because Plaintiff did not indicate an alternative preference on the list provided for her, the high school positions that were available at the start of the Summer were no longer available when it became clear that the preferred position lacked funding.  Dkt. No. 67-33 at ¶ 114; Dkt. No. 77 at ¶ 106 (acknowledging "it was agreed that Plaintiff would stay in Adult Education at the Johnson Center" and that she was assigned a position there before it became clear that the position lacked funding).  Given this initial attempt to honor Plaintiff's preferences, a reasonable juror could not find that the decisions involving her 2022-2023 placement were motivated by retaliation.

In relation to Plaintiff's assertion that she had the skills to teach high school students with severe behavioral issues, again, Plaintiff's claim cannot be taken as "an invitation for courts to sit as a super-personnel department that reexamines employer's judgments."  *Ya–Chen Chen*, 805 F.3d at 73 (2d Cir. 2015) (internal quotation marks omitted).  Plaintiff has provided no evidence that her qualifications were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question."  *Moy*, 712 Fed. Appx. at 41 (citing *Byrnie*, 243 F.3d at 103 (internal quotation marks omitted), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e)).

---

[29] In the alternative, the Court grants summary judgment in relation to Plaintiff's placement for the 2022-2023 school year because the placement does not constitute an "adverse action."  Again, transfers alone are not typically enough to establish an adverse action.  Supra n.26.  Plaintiff admits that her placement for the 2022-2023 school year was identical in all material respects to her previous position, and therefore, could not be considered a demotion.  Dkt. No. 77 at ¶ 134; *see also Casale v. Reo*, 522 F. Supp. 2d 420, 426 (N.D.N.Y. 2007).

Finally, Plaintiff's assertion that "n[]on-certified teachers are routinely displaced by certified teachers," Dkt. No. 76 at 18, does not support a finding of pretext (or for that matter, that a retaliatory motive was the but-for cause of the employment decision). Defendant asserts that the decision not to displace a substitute teacher is driven by a desire to avoid discouraging teachers from accepting positions as long-term substitutes, to encourage long-term substitutes to pursue their certifications with diligence, and to avoid the "administrative nightmare" which would result. Dkt. No. 67-33 at ¶ 129. In her attempt to paint this policy as pretext, Plaintiff provides two possible examples of substitutes being displaced by certified teachers under similar circumstances (though she does not recall the exact name of one of the certified teachers). Dkt. No. 77 at ¶ 106. In a reply affidavit, Defendant provides evidence that contradicts at least one of Plaintiff's examples. Dkt. No. 86-2. Her second example, the placement of Ms. Murray at Fowler High School, is entirely distinguishable. With Ms. Murray's placement, the School District "had no option to leave Ms. Murray in her prior position" due to the alleged Twilight Academy Program misconduct. Dkt. No. 67-33 at ¶ 50. Ms. Murray's placement was not driven by mere preference but by an institutional need.[30] As a result, Plaintiff's sole offered evidence supporting her contention that Defendant's rationale is pretext is insufficient to avoid summary judgment. Regardless, even if the Court were to interpret the evidence as capable of suggesting pretext, Plaintiff has offered no evidence that a retaliatory motive was the but-for cause of the placement.

---

[30] Moreover, Plaintiff provides no basis for her alleged knowledge that these individuals were displaced under similar circumstances. Given that Plaintiff is not involved in the employment decisions of Defendant, Plaintiff arguably relies on hearsay or other forms of inadmissible evidence in her attempt to contradict Defendant's policy. "A party 'cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial.'" *Paola v. DeJoy*, 624 F. Supp. 3d 305, 324 n.7 (W.D.N.Y. 2022) (quoting *Abdel-Karim v. EgyptAir Airlines*, 116 F.Supp.3d 389, 409 (S.D.N.Y. 2015) (citation omitted)). No such showing has been made.

Therefore, the Court concludes that a reasonable juror could not find retaliation was the but-for cause of Plaintiff's placement for the 2022-2023 school year.

###### vi.    Medical Leave Delay

Finally, Plaintiff asserts that Defendant's refusal to allow Plaintiff to return from medical leave in April 2023 constituted retaliation. Defendant asserts that because Plaintiff's physician released her to work with the restriction that she could not lift more than twenty pounds, she could not have possibly performed her duties at her placement. Dkt. No. 67-33 at ¶¶ 145-47. In a reply affidavit, Defendant provides further context; Plaintiff's position involved "addressing the physical needs of students with significant disabilities," and therefore, Defendant's employee Irastina Reid "would never have [permitted] a person with restrictions on standing, bending, or lifting" to return. Dkt. No. 86-4 at ¶ 5. Ms. Reid's affidavit also clarifies that it is standard practice for Health Services, Risk Management, and Employee Services to seek input on whether a teacher returning from leave with restrictions would be able to perform the functions of their job. *Id.* at ¶ 4. In response, Plaintiff attaches the text messages of Tim Conkey, a School District employee, with an unknown teacher in which the teacher asserts she was allowed to work at the School District with similar restrictions to Plaintiff's. Dkt. No. 77 at ¶ 145; Dkt. No. 75-30. The Court has no way of assessing the veracity of these statements, and they would likely be inadmissible at trial without the teacher being willing to testify. Tellingly, even if the Court were to consider the messages, the unknown teacher and Mr. Conkey acknowledge that "most of the time, the district won't let people come back with restrictions because they are afraid they'll be re-injured," and that the unknown teacher was only allowed to return because the district was "desperat[e]." Dkt. No. 75-30. Thus, Plaintiff's proffered evidence largely supports Defendant's rationale. Regardless, Plaintiff fails to offer any competent evidence whatsoever that other School District employees

39

with similar restrictions were allowed to return to positions with demands similar to the demands of Plaintiff's special education position.  At most, Plaintiff's evidence can be read to suggest that some employees with restrictions are permitted to return to their jobs; the evidence says nothing about returning to jobs as physically demanding as Plaintiff's.  Therefore, Plaintiff has failed to carry her burden, and the Court grants summary judgment in relation to the sole remaining allegations involving Plaintiff's return from medical leave.

## V.    CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendant's motion for summary judgment, Dkt. No. 67, is **GRANTED**; and the Court further

**ORDERS** that Plaintiff's letter motion to strike documents, Dkt. No. 88, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules, and close the case.

**IT IS SO ORDERED.**

Dated: January 21, 2025
       Albany, New York

Anne M. Nardacci
U.S. District Judge